IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

REBECCA MARTINEZ,

    Plaintiff,

vs.                                                        Civ. No. 12-660 KG/WPL

SOUTHWEST CHEESE COMPANY, L.L.C.,

    Defendant.

MEMORANDUM OPINION AND ORDER

This matter comes before the Court upon Defendant Southwest Cheese Company's Motion for Summary Judgment (Motion for Summary Judgment), filed on March 5, 2013. (Doc. 38). Plaintiff filed her response on March 19, 2013, and Defendant Southwest Cheese Company, L.L.C. (SWC) filed its reply on April 2, 2013. (Docs. 43 and 59). Having reviewed the Motion for Summary Judgment, the accompanying briefs, and the material and admissible evidence of record, the Court grants, in part, the Motion for Summary Judgment.

A. Background

    *1. The Facts*

Plaintiff brings this gender, race, and age discrimination lawsuit against her former employer, SWC. The following statement of facts is based on the material and admissible evidence of record and reflects the evidence viewed in the light most favorable to Plaintiff, with all reasonable inferences drawn in her favor.

        *a. Promotions and Raises*

SWC employed Plaintiff, a Hispanic female born in 1959, from November 2005 until April 2011, when Plaintiff resigned. (Doc. 43-1) at ¶¶ 1-2. Plaintiff began work at SWC as a

Level 2 Operator. (Doc. 38-1) at 27. In May 2006, SWC promoted Plaintiff to a Level 3 Floating Relief position. (Doc. 38-1) at 32. George Chappell, the Cheese Plant Manager, authorized the promotion. *Id.* In March 2007, SWC promoted Plaintiff to an Assistant Team Leader. (Doc. 38-1) at 28. Chappell authorized that promotion as well. (Doc. 38-1) at 29. In April 2008, Plaintiff received a small raise for her participation in the safety committee. (Doc. 38-1) at 34-35. Plaintiff applied for the position of Team Leader four times before SWC promoted her to that position in June 2009. (Doc. 43-1) at 2, ¶ 5; (Doc. 38-1) at 30. SWC also promoted three males under the age of 40 and two white females under the age of 40 to the position of Team Leader. (Doc. 43-1) at 2-3, ¶ 5. As of 2010, SWC employed only eight Team Leaders, who reported to top level management. (Doc. 38-1) at 11-12.

In February 2011, SWC employees received raises of between 0% and 5%. (Doc. 38-1) at 36-37. Plaintiff received only a 2% raise because of performance issues. (Doc. 38-2) at 82-83, Depo. at 54-55. Plaintiff complains that her 2% raise in February 2011 was not comparable to the raises which her peers received. However, the following employees also received 2% raises: one female and one male at Plaintiff's grade, one male at a higher grade than Plaintiff's grade, one female at a lower grade than Plaintiff's grade, and a Hispanic male at a higher grade than Plaintiff's grade. (Doc. 38-1) at 36-37. Moreover, three males received less than a 2% raise, two of whom were Hispanic. *Id.* at 37-37. Those two Hispanic males also had the same grade as Plaintiff did. *Id.*

      b. *Disciplinary Actions Against Plaintiff*

In May 2010, Plaintiff received a one day suspension for losing over 80,000 pounds of cheese. (Doc. 38-2) at 1. Plaintiff acknowledged responsibility for that loss of cheese. *Id.* The next day, Plaintiff received a verbal reprimand for failing to meet with the maintenance Team

Leader. (Doc. 38-2) at 2. Plaintiff did not dispute that infraction. *Id.* In June 2010, SWC suspended Plaintiff one day for failing to sign off on an environmental log sheet. (Doc. 38-2) at 3.

In August 2010, Plaintiff had problems with the cheese towers clogging. (Doc. 38-2) at 12-20. After 30 minutes, Plaintiff called Eric Denton, the Production Manager, about the clogging. (Doc. 43-1) at 9, ¶ 21. Denton's attempt to fix the problem resulted in damage to the equipment. *Id.* Neither the Production Manager, who was on vacation, nor the other Team Leader, who led another unit, could have been responsible for the cheese tower incident.[1] *Id.*

After the cheese tower incident, SWC placed Plaintiff on a PIP to end on October 25, 2010, if Plaintiff's work performance adequately improved. (Doc. 38-2) at 4-6. Areas in need of improvement included time management, decisiveness, training, setting standards, and communication. (Doc. 38-2) at 4. In fact, SWC terminated the PIP on December 14, 2010, but noted that Plaintiff still needed to work on training, setting standards, and communication. (Doc. 38-2) at 11.

Two weeks after the cheese tower incident, Team Leader Justin Musick, a white male under the age of 40, negligently lost a massive amount of cheese. (Doc. 43-1) at 9-10, ¶ 22. As a result of that loss of cheese, SWC suspended Musick for three days. (Doc. 38-2) at 78, Depo. at 44. SWC, nonetheless, promoted Musick to Production Manager the following year. *Id.*

While on the PIP, Plaintiff received a verbal reprimand in September 2010 for signing off on an uncompleted environmental log sheet. (Doc. 38-2) at 21. Just days prior to that reprimand, Plaintiff had acknowledged, in writing, that she must fill out the environmental log

---

[1] Contrary to Plaintiff's allegation that the Production Manager and other Team Leader could not have been responsible for the cheese tower incident, SWC placed a Production Manager and a Team Leader on Performance Improvement plans (PIPs) for their part in this incident. (Doc. 38-1) at 4, ¶ 9.

sheets correctly. (Doc. 38-2) at 22-23. Plaintiff accepted responsibility for not correctly filling out the environmental log sheet. (Doc. 38-2) at 50, Depo. at 129.

      *c. Harassment[2]*

In September 2008, Donnie Romero, a Team Leader, grabbed Plaintiff's right buttock while at work. (Doc. 1-1) at 26, ¶ 4. Plaintiff spoke to Romero in an office about his conduct and told him that she would not tolerate his behavior. *Id.* A few days later, Romero told Plaintiff and others in the SWC break room that he watched Plaintiff through a window at her home vacuum in the nude. (Doc. 43-1) at 3, ¶ 7. That comment caused Plaintiff to feel humiliated and embarrassed. (Doc. 1-1) at 27, ¶ 5. The next day, Plaintiff filed a complaint with Brenda Miller, the SWC Human Resources Director, regarding Romero's comment in the break room. (Doc. 1-1) at 27, ¶ 6. The following day, Plaintiff met with Chappell and David Williamson about her complaint. *Id.* Because Plaintiff feared losing her job and felt pressured by Chappell, she agreed that SWC should verbally reprimand Romero and tell him to stop harassing female employees. (Doc. 1-1) at 27-28, ¶¶ 6-7. SWC, nevertheless, suspended Romero for five days and gave him a written reprimand.[3] (Doc. 38-2) at 73, Depo. at 33; (Doc.

---

[2] This portion of the factual background reflects harassment which Plaintiff personally has knowledge of as well as harassment of other employees which she was aware of. *See Hirase-Doi v. U.S. West Comm., Inc.*, 61 F.3d 777, 782 (10th Cir. 1995) (to rely on allegations of misconduct directed toward other employees, plaintiff must show she was aware of misconduct at the time).

[3] Documentation of the five-day suspension and the written reprimand are not in Romero's personnel file. (Doc. 43-1) at 3, ¶ 7. Although Plaintiff intimates from this lack of documentation that SWC did not suspend Romero or give him a written reprimand, Plaintiff fails to provide any evidence that SWC, in fact, did not give Romero a five-day suspension and a written reprimand. On the other hand, SWC Romero and Miller testified at their respective depositions that Romero received a five-day suspension and a written reprimand. *See* (Doc. 38-2) at 73, Depo. at 33; (Doc. 38-2) at 97, Depo. at 30.

38-2) at 97, Depo. at 30.  Romero left SWC in July 2009, but SWC later rehired Romero in June 2011 as a Team Leader.  (Doc. 59-2) at 4, 6, Depo. at 12, 20.

Romero did not harass Plaintiff after she complained to Miller about the break room comment.  (Doc. 59-2) at 11, Depo. at 139.  However, Plaintiff saw Romero inappropriately touch female employees after she complained to Miller about Romero's break room comment.[4]  (Doc. 43-1) at 4, ¶ 9.  For example, Plaintiff saw that Romero "was always trying to grab" two female employees and that he touched them.  (Doc. 63-1) at 4, Depo. at 137-139.  In 2009, Plaintiff further witnessed Romero grabbing a female employee's buttocks as well as touching two female employees' breasts.  (Doc. 63-1) at 8, Depo. at 181-83.  Plaintiff also was aware that Misty English, an SWC employee, knew that Romero sexually harassed female employees.  (Doc. 63-1) at 2, Depo. at 75-76.  In fact, SWC disciplined Romero for making inappropriate remarks to a female employee by suspending him for three days in May and April 2009 and by moving him to another shift.  (Doc. 48-20) at 1.

Plaintiff was also aware that another SWC employee, Cody Stewart, exposed himself to female employees and she was concerned that Stewart would do the same to her.  (Doc. 43-1) at 7, ¶ 14.  Apparently, in October 2010, three women accused Stewart of exposing himself to them

---

[4] Oddly, Plaintiff also testified at her deposition that she did not see Romero touch any other female employees subsequent to her complaint to Miller about Romero's break room comment. (Doc. 59-2) at 12, Depo. at 181.

on two occasions.[5] Stewart denied exposing himself to those women. (Doc. 45) at 9-10, Depo. at 32-33; (Doc. 48-14) at 3, Depo. at 87-88 ; (Doc. 48-15) at 1, Depo. at 96.

Additionally, Plaintiff heard a lot of employees used the "F" word, including Romero. (Doc. 48-7) at 1, Depo. at 34. Plaintiff considered that language part of the work "culture." (Doc. 38-2) at 42, Depo. at 57. Plaintiff also admitted to using language like "punk bitch" in the workplace. *Id.*

Other than Plaintiff's complaint to SWC about Romero's comment in the break room, Plaintiff did not make any other sexual harassment complaints to Miller during the remainder of her employment with SWC. (Doc. 38-2) at 35, ¶ 10. Plaintiff sought employment outside of SWC between 2009 and 2011 because of what she perceived to be a hostile work environment. (Doc. 43-1) at 7, ¶ 15.

### d. *Plaintiff's August 2010 Letter of Grievance*

A few days after SWC placed Plaintiff on the PIP in August 2010, Plaintiff submitted a letter of grievance to Miller. Plaintiff stated in the letter of grievance that since her employment began in November 2005 she has "observed and experienced situations that have been unjust and unfair." (Doc. 38-2) at 24. Plaintiff listed the following concerns:

- Prejudice, against race, age, and gender

- Sexual Harassment, corrective action taken depending on who you are (Different rules for different people)

---

[5] Plaintiff further presents evidence that Stewart took a picture of his genitals at a November 2008 party at a restaurant. However, SWC did not sponsor that party and there is no evidence that Plaintiff was aware of that incident. (Doc. 48-11) at 1-3, Depo. 31-40. Other incidents concerning Stewart took place after Plaintiff terminated her employment with SWC. (Doc. 48-9) at 3, Depo. at 10-12); (Doc. 48-10) at 1, Depo. at 13-14; (Doc. 48-12) at 2-3, Depo. at 45-51; (Doc. 48-13) at 1-2, Depo. at 57-62. Plaintiff also presents evidence that males referred to their genitals as "the brain," but once again, Plaintiff does not present any evidence that she was aware of that conduct. (Doc. 48-16) at 2, Depo. at 115-16.

- Unjustified promotions, positions created for select groups and promotions given based one [sic] who you know.

- Unjustified dismissals, good hard working employees let go based on hearsay.

- Corrective action, taken on a personal level instead of standardization (Different rules for different people)

*Id.*

On August 30, 2010, Miller and Chappell met with Plaintiff regarding her letter of grievance. Plaintiff noted the following at the meeting: Fred Dale told her that employees used racial slurs which two management employees overheard; Plaintiff felt that she was unfairly placed on the PIP when Denton damaged the equipment trying to fix the cheese tower problems; Chappell had a personal vendetta against Plaintiff; in 2006, Chappell told Plaintiff that she should work in sanitation scrubbing floors even though there was no sanitation department at that time; Plaintiff filed a sexual harassment claim against Romero, but Plaintiff felt coerced by Chappell and Williamson regarding how to handle Romero; Plaintiff felt that she was passed up for promotions; and a male employee was not doing his work. (Doc. 38-2) at 25-26, 84-88, Depo. at 62-66; (Doc. 43-1) at 10-12, ¶¶ 23-27. Miller indicated at the meeting that SWC would provide Plaintiff with technical training. (Doc. 38-2) at 25. Chappell also stated at the meeting that he did not recall telling Plaintiff that she should go to sanitation. *Id.* Plaintiff told Miller and Chappell that she had documentation from employees that specifically addressed how SWC treated them differently and that she had a signed statement from Dale about the racial slurs. (Doc. 38-2) at 25, 27. Plaintiff further felt that Denton and Chappell singled her out, but she did not know if they did so because of her gender, race, age, or because she was "heavy." (Doc. 38-2) at 58, Depo. at 148.

Although Miller and Chappell asked Plaintiff to bring in her documentation so they could conduct an investigation, Plaintiff did not do so. (Doc. 38-2) at 27. Plaintiff later stated that she

7

"made a terrible mistake" and that she did not have any documentation of the allegations she made. *Id*. In fact, Dale would not provide Plaintiff with a statement regarding the racial slurs because he feared losing his job if he did so. (Doc. 43-1) at 12, ¶ 25. Miller, nonetheless, conducted an investigation wherein she spoke with Denton, Williamson, and Dale about the racial slurs. (Doc. 38-2) at 85, 89, Depo. at 63, 67. Miller found each of Plaintiff's complaints to be baseless: the complaint of racial slurs were unfounded; Plaintiff's PIP and corrective actions were for admitted poor performance; when aware of employee misconduct, SWC disciplined employees engaged in the misconduct; SWC did not pass Plaintiff over for promotions; and SWC disciplined Romero based on Plaintiff's complaint. (Doc. 38-2) at 35, ¶ 11. Chappell also did not understand why Plaintiff believed that he had a personal vendetta against her since he trained Plaintiff and approved four of her promotions within a three and a half year period. (Doc. 38-1) at 4, ¶ 7.

As a result of the investigation into Plaintiff's letter of grievance, on September 7, 2010, SWC suspended Plaintiff for one day for not providing "accurate and detailed information to [her] manager and to Human Resources regarding issues with discrimination and harassment." (Doc. 38-2) at 27. The corrective action further stated: "Your lapse of judgment on how you reported this incident claiming that you had documentation when you did not gives rise to your credibility on such issues." *Id.* Plaintiff had "no comment" on this disciplinary action. *Id.*

### e. *Plaintiff's Resignation*

Plaintiff resigned from SWC in April 2011 because she felt that SWC drove her out. (Doc. 38-2) at 59, Depo. at 164. During an exit interview, Plaintiff noted that she decided to leave SWC to open a new restaurant. (Doc. 38-2) at 28; (Doc. 38-2) at 81, Depo. at 47. Plaintiff, however, noted that training would have prevented her from leaving SWC. (Doc. 38-2)

at 28.  In addition, Plaintiff explained that her new venture would be for her, something her old position did not provide.  (Doc. 38-2) at 29.  Plaintiff observed that if she could have changed anything in the last six months she would have learned more.  (Doc. 38-2) at 30.  When asked what, if anything, SWC could do to keep her, Plaintiff responded "not today."  (Doc. 38-2) at 31.

    *2. The Complaint (Doc. 1-1)*

On July 6, 2011, Plaintiff filed an affidavit and charge of discrimination based on race, age, and gender with the New Mexico Department of Workforce Solutions, Human Rights Bureau, and then filed an amended charge of discrimination on July 29, 2011.  (Doc. 1-1) at 21-31.  On May 3, 2012, Plaintiff received an Order of Nondetermination from the New Mexico Department of Workforce Solutions, Human Rights Bureau.  (Doc. 1-1) at 19-20.  On May 17, 2012, Plaintiff filed this lawsuit in the Ninth Judicial District Court, County of Roosevelt, State of New Mexico.  (Doc. 1-1).  SWC removed the state lawsuit to federal court on June 18, 2012.  (Doc. 1).

Plaintiff brings the following claims in the complaint against SWC:  New Mexico Human Rights Act (NMHRA) and Title VII hostile work environment claims based on sexual harassment; constructive discharge claims brought under Title VII, 42 U.S.C. § 1981, the Age Discrimination in Employment Act (ADEA), and under a breach of contract claim; a claim intentional infliction of emotional distress; and a negligent supervision claim.

*B. The Motion for Summary Judgment*

SWC argues that it is entitled to summary judgment on all of Plaintiff's claims.  First, SWC argues that the hostile work environment claims are time-barred.  Second, SWC argues that the record does not support Plaintiff's allegations of a hostile work environment.  Third, even if Plaintiff could show that SWC subjected her to a hostile work environment, SWC argues that it

would not be directly liable to Plaintiff because SWC remedied the situation. Fourth, SWC argues that it is not vicariously liable for the conduct of its supervisors. Fifth, SWC argues that the record does not provide sufficient factual support for the constructive discharge claims. Sixth, SWC argues that its conduct was not sufficiently extreme and outrageous to support an intentional infliction of emotional distress claim and that Plaintiff's allegations of distress are not sufficiently severe to support that claim. Finally, SWC argues that the negligent supervision claim is time-barred and, in the alternative, that the record does not support that claim. Plaintiff opposes the entire Motion for Summary Judgment.

*C. Summary Judgment Standard*

Summary judgment is appropriate if there is no genuine dispute as to a material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a).[6] When applying this standard, the Court examines the factual record and reasonable inferences therefrom in the light most favorable to the party opposing summary judgment. *Applied Genetics Intl, Inc. v. First Affiliated Sec., Inc.*, 912 F.2d 1238, 1241 (10th Cir. 1990). The moving party bears the initial burden of showing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). Only then does the burden shift to the non-movant to come forward with evidence showing that there is a genuine issue of material fact. *Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th Cir. 1991). An issue of material fact is genuine if a reasonable jury could return a verdict for the non-movant. *Kaul v. Stephan*, 83 F.3d 1208, 1212 (10th Cir.1996) (citation omitted). The non-moving party may not avoid summary judgment by resting upon the mere allegations or denials of his or her pleadings. *Bacchus Indus., Inc.*, 939 F.2d at 891.

---

[6] Rule 56 was amended effective December 1, 2010, but the standard for granting summary judgment remains unchanged.

*D. Discussion*

    *1. Whether the NMHRA and Title VII Hostile Work Environment Claims are Time-Barred*

The NMHRA requires plaintiffs to file charges of discrimination with the appropriate administrative agency within "three hundred days after the alleged act was committed." NMSA 1978, § 28-1-10(A) (2012 Repl. Pamp.). Title VII also requires plaintiffs to file charges of discrimination "within three hundred days after the alleged unlawful practice occurred" in cases, like this one, where plaintiffs first filed charges of discrimination with a state agency. *See* 42 U.S.C. § 2000e-5(e)(1). In both NMHRA and Title VII cases, the timely filing of a charge of discrimination is a "prerequisite to a civil suit." *See Croy v. Cobe Labs., Inc.,* 345 F.3d 1199, 1202 (10th Cir. 2003) (Title VII case); *Mitchell–Carr v. McLendon,* 1999-NMSC-025 ¶ 20, 127 N.M. 282 (NMHRA case). That prerequisite is not jurisdictional, but the failure to file a charge of discrimination at all, i.e., the failure to exhaust administrative remedies, deprives the court of subject matter jurisdiction. *Zipes v. Trans World Airlines, Inc.,* 455 U.S. 385, 393 (1982) (timeliness of Title VII charge of discrimination is not jurisdictional prerequisite); *Jones v. Runyon*, 91 F.3d 1398, 1399 (10th Cir. 1996) (failure to exhaust Title VII administrative remedies is jurisdictional prerequisite); *Slusser v. Vantage Builders, Inc.*, 2013-NMCA-073, 306 P.3d 524 (treating NMHRA 300 day period as statute of limitations, like *Zipes* did in concluding timeliness of charge of discrimination is not jurisdictional); *Mitchell–Carr,* 1999-NMSC-025 ¶ 20 (under NMHRA, exhaustion of administrative remedies is jurisdictional prerequisite to filing lawsuit). Although the Court must liberally construe a charge of discrimination to determine whether a plaintiff has administratively exhausted a claim, both the NMHRA and Title VII require that the charge of discrimination provide a sufficiently precise or specific description of the action or practice of which a plaintiff complains. *See Sparks v. Black Hawk/Jacobs*

*Entertainment, LLC*, 2010 WL 4932678 *5 (D. Colo. 2010) (noting what charge of discrimination must describe in Title VII case); NMSA 1978, § 28-1-10(A) (charge of discrimination must contain "all information relating to the discriminatory practice…."). If an employer contends that a plaintiff failed to file a charge of discrimination, the plaintiff bears the burden of establishing the court's subject-matter jurisdiction. *See Southway v. Cent. Bank of Nigeria,* 328 F.3d 1267, 1274 (10th Cir. 2003); *Rist v. Design Center at Floor Concepts,* 2013-NMCA-109 ¶ 11, 314 P.3d 6.

Plaintiff filed her original charge of discrimination on July 6, 2011. Three hundred days prior to this date was September 9, 2010. SWC maintains that the alleged acts of sexual harassment occurred prior to September 9, 2010, and are, therefore, untimely and should be barred. Plaintiff argues that since a hostile work environment claim consists of a series of separate acts, she need only file a charge of discrimination within 300 days of any act that constitutes the hostile work environment claim. Plaintiff cites to *Loya v. Wal-Mart Stores East, L.P.*, 669 F.Supp.2d 1266 (D. N.M. 2009), to support her argument. Indeed, in that case, the district court explained how to apply the 300-day period to hostile work environment claims, relying on *Nat'l R.R. Passenger Corp. v. Morgan,* 536 U.S. 101 (2002). And, in a companion case to this one, Senior United States District Court Judge LeRoy Hansen applied *Morgan* as follows:

> In *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101 (2002), the Supreme Court set forth the rule for applying Title VII's 300-day statutory limitation period to hostile work environment claims. In determining whether an actionable hostile work environment claim exists, the Supreme Court specified that "[a] court's task is to determine whether the acts about which an employee complains are part of the same actionable hostile work environment practice, and if so, whether any act falls within the statutory time period." *Id.* at 120. The Court held that "[i]t does not matter, for purposes of the statute, that some of the component acts of the hostile work environment fall outside the statutory time period. Provided that an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be

> considered by a court for the purposes of determining liability." *Id.* at 116; *see also id.* at 118 (reiterating that "the employee need only file a charge within . . . 300 days of *any act* that is part of the hostile work environment" in order for the charge to be considered timely (emphasis added)). Similarly, with regard to hostile work environment claims brought under the NMHRA, the Supreme Court of New Mexico has adopted *Morgan* in evaluating time limitation issues. *See Ulibarri*, 2006-NMSC-009, ¶ 11.

*Macias v. Southwest Cheese Company, L.L.C.*, Civ. No. 12-350 LH/WPL, (Doc. 61) at 13-14, filed June 11, 2014. The Court must, therefore, determine whether the acts outside the filing period and the acts within the filing period "are sufficiently related to constitute the same employment practice." *Tademy v. Union Pacific Corp.*, 614 F.3d 1132, 1140 (10th Cir. 2008). Factors in making that determination include whether "the pre-and post-limitations period incidents involved the same type of employment actions, occurred relatively frequently, and were perpetrated by the same" employees. *Duncan v. Manager, Dept. of Safety, City and County of Denver*, 397 F.3d 1300, 1309 (10th Cir. 2005).

Here, the pre-September 9, 2010, acts include Romero touching Plaintiff in September 2008; Romero making the nude vacuuming remark to Plaintiff in September 2008; and Plaintiff witnessing Romero harassing female employees in 2009. Also, Plaintiff's other hostile work environment allegations concerning Romero harassing female employees would have occurred prior to Romero resigning his employment in July 2009. Moreover, SWC investigated and made its determination regarding Plaintiff's letter of grievance on September 7, 2010, two days prior to the September 9, 2010, deadline.

Although Plaintiff contends that she was aware that Stewart exposed himself to female employees, the pre-September 9, 2010, acts of harassment by Romero did not include indecent exposure. Furthermore, Plaintiff does not provide a time frame for her awareness of Stewart's conduct. The record, however, apparently contains only two incidents of three female employees complaining about Stewart exposing himself in October 2010, within the 300-day period.

Plaintiff also does not mention Stewart's indecent exposure in her pre-September 9, 2010, letter of grievance or at the later meeting with Miller and Chappell to address the letter of grievance. Plaintiff further did not complain of Stewart's indecent exposure in either her original charge of discrimination or the amended charge of discrimination. In fact, aside from quoting a summary of the law from *Loya* and *Duncan*, Plaintiff does not argue how any of the pre-September 9, 2010, inappropriate conduct is sufficiently related to any of the post-September 9, 2010, conduct.

Viewing the evidence in the light most favorable to Plaintiff, a reasonable jury could not find that (1) Romero's pre-September 9, 2010, misconduct involved the same type of misconduct perpetuated by Stewart after September 9, 2010, i.e., indecent exposure; (2) the post-September 9, 2010, indecent exposure by Stewart occurred relatively frequently; or (3) the pre-and post-September 9, 2010, misconduct described above were perpetrated by the same employees. In sum, Plaintiff has failed to show that the harassment by Romero which occurred outside the 300-day filing period and the indecent exposure by Stewart which occurred within the 300-day filing period are "sufficiently related to constitute the same employment practice." Hence, SWC has demonstrated an absence of a genuine issue of material fact as to whether Plaintiff timely filed her hostile work environment charge of discrimination based on the above misconduct. The Court will, therefore, grant summary judgment on those NMHRA and Title VII hostile work environment claims

Finally, assuming that the use of foul language occurred throughout Plaintiff's employment with SWC, Plaintiff did not complain of foul language, which she admittedly engaged in to some extent, either in her original charge of discrimination or in the amended charge of discrimination. Plaintiff, likewise, did not raise any concern about foul language in her pre-September 9, 2010, letter of grievance or at the subsequent meeting with Miller and Chappell

to discuss the letter of grievance. Since Plaintiff did not raise the foul language assertion in any of her charges of discrimination, or otherwise, Plaintiff has failed to exhaust any hostile work environment claims based on that assertion. Thus, the Court lacks subject matter jurisdiction over those claims and will, therefore, dismiss without prejudice any hostile work environment claims based on the use of foul language.

      2. *Constructive Discharge Claims: Title VII, Section 1981, the ADEA, and the Breach of Contract Claim*

SWC argues next that it is entitled to summary judgment on Plaintiff's constructive discharge claims she brings under Title VII, Section 1981, the ADEA, and the breach of contract claim. *See, e.g., Fischer v. Forestwood Co., Inc.*, 525 F.3d 972 (10th Cir. 2008) (ADEA constructive discharge claim); *E.E.O.C. v. PVNF, L.L.C.*, 487 F.3d 790 (10th Cir. 2007) (Title VII constructive discharge claim); *Irving v. Dubuque Packing Co.*, 689 F.2d 170 (10th Cir. 1982), *overruled on other grounds by Koch v. City of Hutchinson,* 814 F.2d 1489 (10th Cir. 1987) (Section 1981 constructive discharge claim); *Gormley v. Coca-Cola Enterprises*, 2005-NMSC-003, 137 N.M. 192 (breach of contract constructive discharge claim). The Court applies the same constructive discharge standard for all of these claims. *See id.* The Tenth Circuit has explained constructive discharge as follows:

> "Constructive discharge occurs when the employer by its illegal discriminatory acts has made working conditions so difficult that a reasonable person in the employee's position would feel compelled to resign." In evaluating whether the employee's working conditions would cause such a feeling in a reasonable person, "we apply an objective test under which neither the employee's subjective views of the situation, nor her employer's subjective intent ... are relevant." The plaintiff's burden in a constructive discharge case is substantial and showing that the employer's conduct meets the definition of "tangible employment action" or "adverse employment action" is "not necessarily sufficient to establish a constructive discharge because a constructive discharge requires a showing that the working conditions imposed by the employer are not only tangible or adverse, but intolerable." Importantly, in constructive discharge cases "[t]he question is not whether the employee's resignation resulted from the employer's actions, but whether the employee had any other reasonable choice but to resign in light of those actions."

*PVNF, L.L.C.*, 487 F.3d at 805-806 (internal citations omitted).  Examples of sufficiently adverse employment actions which can lead to a constructive discharge include:  humiliating demotions, extreme cuts in pay, transfers to positions with unbearable working conditions, overt pressure to leave and accept early retirement, and retaliatory actions.  *Gormley*, 2005-NMSC-003 at ¶ 11 (internal quotation marks and citations omitted).  Factors which the Court considers in determining if an employer constructively discharged an employee include:  aggravating factors beyond any discriminatory act, whether the employer provided the employee with alternatives to resigning, and whether an employee notified the employer of problems and gave the employer an opportunity to resolve the problem before resigning.  *Exum v. U.S. Olympic Committee*, 389 F.3d 1130, 1136 (10th Cir. 2004); *Irving*, 689 F.2d at 173; *Gormley*, 2005-NMSC-003 at ¶¶ 19 and 21 (citing *Woodward v. City of Worland*, 977 F.2d 1392, 1402 (10th Cir. 1992)).  A failure to promote, unequal pay, and "casual and intermittent" slurs without more do not always amount to a constructive discharge.  *Irving*, 689 F.2d at 172.  In sum, "constructive discharge occurs when an employer effectively prevents an employee from performing his job."  *Rodriguez v. America Online, Inc.,* 183 F.Supp.2d 1340, 1356 (D.N.M. 2001).

  Plaintiff contends that she had no other choice but to resign because SWC passed her over for promotions; she received a smaller pay raise than other Team Leaders in February 2011; SWC disciplined her more harshly than other employees in 2010; and she was sexually harassed.  SWC argues that the record does not support Plaintiff's contention that she was passed over for promotions.  Although Plaintiff applied four times for a promotion to Team Leader and SWC promoted three males under the age of 40 and two white females under the age of 40 to Team Leaders, SWC actually promoted Plaintiff three times with Plaintiff finally attaining an upper

level position as a Team Leader.  Moreover, Plaintiff has not produced any admissible evidence that SWC rejected any of her applications for promotions on a discriminatory basis.  Viewing the evidence in the light most favorable to Plaintiff, a reasonable jury could not find that SWC impermissibly refused to promote Plaintiff.

Next, SWC argues that the record does not support Plaintiff's contention that she received a smaller pay raise than other Team Leaders in February 2011.  In February 2011, SWC employees received raises of between 0% and 5%.  It is undisputed that SWC determined the raises on the basis of performance and that Plaintiff received only a 2% raise because of performance issues.  Moreover, a mix of female, male, and Hispanic employees at Plaintiff's grade, at grades lower than Plaintiff's grade, and even at grades higher than Plaintiff's grade received 2% raises.  In addition, three males received less than a 2% raise, two of whom were Hispanic.  Those two Hispanic males were also the same grade as Plaintiff's grade.  Viewing this evidence in the light most favorable to Plaintiff, a reasonable jury could not find that Plaintiff's pay raise of 2% was not comparable to raises her peers at the same grade level received or that SWC based the 2% raise on any discriminatory intent.

Furthermore, SWC argues that the record does not support Plaintiff's contention that SWC disciplined her more harshly than other employees.  Plaintiff specifically asserts that SWC treated her unfairly by only placing her on a PIP for the August 2010 cheese tower incident and by not disciplining Denton for damaging machinery.  However, SWC did suspend another male Team Leader, Musick, for three days for a large loss of cheese.  Plaintiff does not produce any evidence suggesting that Musick should have been placed on a PIP.  Moreover, SWC did not promote Musick until the year following his large loss of cheese.  In addition, Plaintiff argues that SWC disciplined her more harshly than other employees for failing to sign environmental

log sheets, other losses of cheese, and failing to properly communicate with maintenance Team Leaders.  Plaintiff does not, however, present any admissible evidence that SWC did not, in fact, similarly discipline other employees for those kinds of transgressions.  Viewing the evidence in the light most favorable to Plaintiff, a reasonable jury could find that SWC disciplined Plaintiff more harshly than another employee with respect to only the August 2010 cheese tower incident.

Moreover, SWC argues that Plaintiff has produced insufficient evidence of conduct by SWC to support a constructive discharge claim.  The evidence, even when viewed in the light most favorable to Plaintiff, shows that SWC promoted Plaintiff to Team Leader and gave her a 2% raise in February 2011 that was in line with others within her grade, but placed Plaintiff on a PIP without disciplining Denton.  Furthermore, Romero left SWC in July 2009, well before Plaintiff resigned from SWC in April 2011.  Although Plaintiff was aware of Stewart exposing himself presumably in October 2010 and she was concerned that he would expose himself to her, Plaintiff does not allege that this concern affected her ability to perform her job duties.  In addition, Plaintiff does not contend that the use of foul language impeded her work.  Plaintiff also successfully completed her PIP in December 2010, and there is no evidence that SWC disciplined Plaintiff after December 2010.  Notably, during her exit interview, Plaintiff did not suggest that she was leaving SWC due to any kind of intolerable conditions.  Moreover, Plaintiff did not take advantage of a clear opportunity in the same interview to explain what SWC could have done to keep her at SWC.

Plaintiff has failed to produce evidence of anything like a demotion, extreme cut in pay, a transfer to a position with unbearable working conditions, threats of being fired, overt pressure to resign, or retaliatory measures.  Simply put, Plaintiff has not produced evidence of aggravating factors that would have made staying at SWC intolerable and would have prevented her from

performing her job. A reasonable jury, viewing the evidence in the light most favorable to Plaintiff, could not find that Plaintiff carried her substantial burden of demonstrating that SWC's working conditions were so difficult that a reasonable person in her position would have felt compelled to resign. Consequently, a reasonable jury could not find that SWC constructively discharged Plaintiff from her employment. The Court will grant summary judgment on Plaintiff's constructive discharge claims brought under Title VII, Section 1981, the ADEA, and the breach of contract claim.

      *3. Intentional Infliction of Emotional Distress and Negligent Supervision Claims*

Having determined to dismiss Plaintiff's federal claims, Plaintiff is left with two state claims: the intentional infliction of emotional distress claim and the negligent supervision claim. Under 28 U.S.C. § 1367(c)(3), a district court may decline to exercise supplemental jurisdiction over state claims if "the district court has dismissed all claims over which it has original jurisdiction." "When all federal claims have been dismissed, the court may, and usually should, decline to exercise jurisdiction over any remaining state claims." *Koch v. City of Del City*, 660 F.3d 1228, 1248 (10th Cir. 2011) (internal citation omitted). The Court declines to exercise supplemental jurisdiction over the intentional infliction of emotional distress and negligent supervision claims. Accordingly, the Court will remand the remainder of this case to the Ninth Judicial District Court, County of Roosevelt, State of New Mexico.

    IT IS ORDERED that:

    1. Defendant Southwest Cheese Company's Motion for Summary Judgment (Doc. 38) is granted, in part;

    2. any NMHRA and Title VII hostile work environment claim based on foul language will be dismissed without prejudice for lack of subject matter jurisdiction;

3. summary judgment will be entered in SWC's favor on the remaining NMHRA and Title VII hostile work environment claims, and those claims will be dismissed with prejudice;

4. summary judgment will be entered in SWC's favor on the Title VII, Section 1981, ADEA, and the breach of contract constructive discharge claims, and those claims will be dismissed with prejudice; and

5. the remainder of this case will be remanded to the Ninth Judicial District Court, County of Roosevelt, State of New Mexico.

_____
UNITED STATES DISTRICT JUDGE